J-A07042-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: O.T.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.M.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1352 MDA 2025 |

Appeal from the Decree Entered September 5, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88762

| | | |
|---|---|---|
| IN RE: J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.M.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1353 MDA 2025 |

Appeal from the Decree Entered September 5, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88763

| | | |
|---|---|---|
| IN RE: A.M.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.M.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1354 MDA 2025 |

Appeal from the Decree Entered September 5, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88764

| | | |
|---|---|---|
| IN RE: E.R.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

J-A07042-26

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>APPEAL OF: T.M.G., MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 1355 MDA 2025</td></tr>
</table>

Appeal from the Decree Entered September 5, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88765

BEFORE:  BOWES, J., DUBOW, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:                    **FILED MARCH 24, 2026**

Appellant, T.M.G. ("Mother"), appeals from the orphans' court September 5, 2025 decrees, which involuntarily terminated her parental rights to her children, O.T.C. (born September 2017), J.L.B. (born June 2019), A.M.B. (born July 2020), and E.R.B. (born October 2021) (collectively "Children").[1]  Mother's counsel, Emily Cherniack, Esquire, has filed an application to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).[2]  Upon review, we affirm the decrees and grant the application to withdraw.

---

[1] O.T.C.'s father is unknown.  **See** Final Decree at Docket No. 88762, 9/5/25, at 1-2 (unnumbered); N.T., 5/12/25, at 97-98.  J.L.B., A.M.B., and E.R.B.'s father is L.H.B.  **See** N.T., 5/12/25, at 98.  The orphans' court terminated the parental rights of the respective fathers by decrees entered in September 2025.  L.H.B. did not appeal and is not a participating party to the instant appeals.

[2] **See also In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending **Anders** procedure to appeals from decrees of involuntary termination of parental rights).

- 2 -

**Background**

Berks County Children and Youth Services ("BCCYS") obtained emergency custody of Children on August 22, 2022, after Mother arrived at BCCYS's office with Children requesting assistance. *See, e.g.*, BCCYS Exhibit 9. On August 31, 2022, following an adjudication hearing, Children were adjudicated dependent and custody was transferred to BCCYS for placement purposes with a goal of return to most appropriate parent and a concurrent goal of adoption. *See, e.g.*, BCCYS Exhibit 17 at 1-2. The court ordered Mother shall have visitation with Children at least once every two weeks for two hours, with visits being fully and professionally supervised. *Id.* at 2. The court also ordered Mother to establish and maintain stable and appropriate housing and income; to notify BCCYS of any changes in income or residence; to sign releases for all providers; and to participate in parenting education, mental health evaluation and any recommendations, drug and alcohol evaluation and any recommendations, random urinalysis, and casework services through BCCYS and any recommendations. *Id.*

In subsequent review hearings, Mother was found minimally or moderately compliant with the permanency plan and to have made no or moderate progress in alleviating the circumstances that led to Children's removal. *See, e.g.*, BCCYS Exhibit 22, BCCYS Exhibit 26, BCCYS Exhibit 32, BCCYS Exhibit 35, BCCYS Exhibit 94. BCCYS filed petitions to involuntarily terminate Mother's parental rights to Children on November 21, 2023, pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption

Act.[3]  A two-day hearing was held on January 23, 2025 and May 12, 2025.  At the hearing, BCCYS presented testimony from Laura Fritts, PsyD.; Ashtyn Beers; Amy Wittmaier; Maria Yee, M.D.; Lois Good; and Jennifer Kemmerer. Mother proffered testimony on her own behalf.

We glean the following, in pertinent part, from the transcripts of those proceedings.  On August 22, 2022, Ms. Kemmerer — an adoption caseworker at BCCYS — said Mother appeared at BCCYS's office with Children, "reporting that she did not feel … she was a competent enough mother at that time to care for the [C]hildren and [requesting] assistance."  N.T., 5/12/25, at 99; *see also id.* at 96.  Ms. Kemmerer conveyed Mother had recently relocated to Pennsylvania from Ohio following allegations of sexual abuse made by O.T.C. against L.H.B.  *Id.* at 99-100.  Ms. Kemmerer said Mother had family in Pennsylvania, but Mother did not receive the support she anticipated from them.  *Id.* at 99.  According to Ms. Kemmerer, Mother had just one suitcase with the family's belongings, Children had scabies and no shoes on, and

_____

[3] The court appointed counsel to serve as Children's guardian *ad litem* ("GAL") and legal counsel, after determining counsel has no conflict serving in both capacities.  *See, e.g.*, Order at Docket No. 88762, 9/10/24.  We remind the orphans' court and attorneys this information should be prominently featured in the orphans' court's opinion and the briefs on appeal.  *See Matter of Adoption of A.C.M.*, 333 A.3d 704, 709 n.7 (Pa. Super. 2025); *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) (granting "*sua sponte* review to evaluate (1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict").  We also observe Children's GAL/legal counsel has advocated for the termination of Mother's parental rights.  *See* N.T., 5/12/25, at 169-71; Children's GAL/Legal Counsel's Brief.

Mother tested positive for both marijuana and alcohol. *Id.* at 100. In response, Ms. Kemmerer explained:

> [BCCYS] attempted to get [Mother] into shelter placements. Because she did not have residency in Berks County, we weren't able to do that. We were able to reach out to [Mother's] mother, and her mother agreed to have [Mother] and [C]hildren come reside with her. That was the plan at that point in time.
>
> Later that same night[,] we were informed by [Mother] that she had left the home because she did not feel that there was enough room in the home and she was also uncomfortable because she said that her mother's paramour had sexually abused her as a child.
>
> ***
>
> [Mother and Children] were just walking the streets of Reading at that point. And at that time is when the agency filed the petition for emergency custody because [Mother] would not engage in the safety plan to have [C]hildren go stay with … her mother without the paramour having any contact with [C]hildren.
>
> ***
>
> [T]here was a shelter care hearing and [C]hildren did remain in the care of the agency at that point in time. And then the agency filed dependency petitions and there was an adjudicatory hearing on August 31st of 2022[, where Children were adjudicated dependent and Mother was ordered to participate in services, as set forth *supra*. Children were placed in foster care as discussed *infra*].

*Id.* at 101-02.

In October and November 2022, Dr. Fritts — a psychotherapist and expert in the fields of clinical psychology and evaluations for parental fitness — completed a psychological evaluation for parental fitness on Mother. N.T., 1/23/25, at 4-6. At that time, Dr. Fritts recalled Mother's housing was unstable, as Mother "came from Ohio to Pennsylvania without a plan. She

was uncertain where she was going to be living with any permanence." *Id.* at 11. Dr. Fritts also noted that Mother had found employment as a home caregiver but was not getting cases, so "she was effectively unemployed while still being employed." *Id.* During the evaluation, Mother discussed her excessive use of marijuana with Dr. Fritts, which Mother said she used to soothe herself when she was feeling "too emotional." *Id.* at 9. Mother also indicated to Dr. Fritts she had been diagnosed with schizoaffective disorder and bipolar disorder, and expressed concerns to Dr. Fritts about having suicidal thoughts. *Id.* at 10.[4] Dr. Fritts described Mother's mental health treatment at that point as "sporadic[,]" explaining Mother "had been [undergoing mental health treatment] and then would stop and then she would start again and stop." *Id.* at 40-41. Mother shared with Dr. Fritts that "she felt extremely close and loving toward her children" and "was concerned about their livelihood." *Id.* at 12.

After the completion of the evaluation, Dr. Fritts stated she had concerns about Mother's "unstable housing, unstable mental health, unstable support system, [and] poverty." *Id.* at 18. Dr. Fritts noted, *inter alia*, that Mother would "benefit from a mental health treatment program until … she and her treatment team have concluded … she has consistently been able to use healthier coping skills in response to stressors … and can make informed and

_____

[4] ***See also*** N.T., 1/23/25, at 26 (Dr. Fritts's explaining schizoaffective disorder is "essentially bipolar disorder with psychosis. So an individual who has been diagnosed with that will have experienced mood swings at various times accompanied by some hallucinatory behavior").

judicious, conscientious choices regarding her needs and the needs of her children." BCCYS Exhibit 64 at 10.

According to Ms. Kemmerer, Mother did not visit with Children from August 2022 until March 2023 because Mother initially failed to obtain a medical clearance related to scabies and also "was afraid that if she saw [C]hildren, … she would feel compelled to leave with [C]hildren…." *See* N.T., 5/12/25, at 116-17. On January 31, 2023, the court suspended visitation with Mother and ordered that visitation shall be offered every other week for one hour upon Mother's request. *See* BCCYS Exhibit 22 at 3. Mother subsequently requested visits and began visits with Children on March 6, 2023. *See* N.T., 5/12/25, at 116-17.

In April 2023, Dr. Yee — an expert in the field of psychiatry — completed a psychiatric evaluation of Mother. *Id.* at 56-58. When Dr. Yee evaluated Mother, Dr. Yee opined that Mother did not suffer from any major psychiatric illnesses, like schizoaffective disorder or bipolar disorder, and that the psychosis experienced by Mother was drug induced. *Id.* at 62-63. Dr. Yee explained extensive use of marijuana can lead to severe psychosis and mood instability, and Mother admitted to Dr. Yee that she had been using marijuana heavily on a daily basis. *Id.* at 64-65. Dr. Yee opined Mother has severe cannabis use disorder. *Id.* at 66.[5] Dr. Yee said Mother did not have a medical marijuana card, and Dr. Yee did not recommend she get a medical marijuana

_____

[5] Oddly, page 66 of the May 12, 2025 transcript appears between pages 87 and 88 of the transcript.

card as "research has indicated that the only conditions that medical marijuana is effective [for] are seizures and pain due to cancer, neither of which [Mother] has." *Id.* Dr. Yee stated Mother is "using the cannabis to self-medicate herself and as a coping mechanism[,] so she uses it whenever she's under stress, or, actually, even to … just get high and be in a state where she does not have to face reality." *Id.* at 66-67. Dr. Yee described Mother's prognosis as guarded, noting that Mother takes no responsibility for losing Children and has admitted that she is having a difficult time stopping the use of marijuana. *Id.* at 70-71, 73. Dr. Yee stated Mother "needs continued involvement and drug and alcohol treatment[,] as well as mental health treatment to address her poor coping skills…." BCCYS Exhibit 65 at 11. The doctor also said Mother needed to "tak[e] ownership and responsibility for the events in her life and how these [events] affect her children." *Id.*

Both Ms. Kemmerer and Ms. Beers — a senior foster care caseworker at COBYS Family Services — spoke of Mother's missing medical appointments and educational meetings for Children. N.T., 1/23/25, at 52. Specifically, Ms. Beers recalled sending Mother notifications about Children's medical appointments and educational meetings since the beginning of the case so Mother would have an opportunity to attend them. *Id.* at 66. Ms. Beers reported, when she would notify Mother about meetings for A.M.B.'s individualized educational plan involving speech therapy, Mother failed to attend the meetings. *Id.* at 66-67. Similarly, she claimed Mother has not participated in Children's medical appointments, even via phone, in

approximately a year. *Id.* at 73. In addition, Ms. Beers explained when she would reach out to Mother to obtain her consent for Children to receive certain care, Mother "responded some of the times and then other times she has not responded and I have to go through the county to retrieve the consent to get the kids seen." *Id.* at 68. Likewise, Ms. Kemmerer stated Mother has not attended any medical appointments for Children over the past two-and-a-half years, missed A.M.B.'s educational meetings, and has not participated in any therapeutic services for Children despite being asked to do so. N.T., 5/12/25, at 116.

Ms. Beers noted E.R.B. has struggled with febrile seizures, was hospitalized in December 2023, and had to see a neurologist for a time. N.T., 1/23/25, at 67, 85; *see also* N.T., 5/12/25, at 127, 144 (Ms. Kemmerer's indicating E.R.B. additionally has asthma and breathing issues). Ms. Beers also recounted the struggles of O.T.C., whom she said became actively suicidal and would make homicidal threats beginning in the spring of 2024. N.T., 1/23/25, at 70. Ms. Beers stated she would get frequent calls "for [O.T.C.] due to her mental health, her wanting to jump off the … resource home's deck, [and her] saying … she wanted to die[ and] want[ed] to jump out of a moving vehicle." *Id.* Ms. Beers noted these incidents began around the time Mother had stopped having biweekly phone calls with Children. *Id.* Ms. Beers said O.T.C. was hospitalized due to her mental health in August 2024, during which time Ms. Beers had a difficult time getting in touch with Mother. *Id.* at 68, 71-72.

Both Ms. Beers and Ms. Kemmerer detailed the placements of Children. They explained J.L.B., A.M.B., and E.R.B. are in a long-term foster home together. N.T., 1/23/25, at 76-77; N.T., 5/12/25, at 125. Ms. Beers relayed A.M.B. and E.R.B. have been in this home since they were taken into care in 2022, and said they are "both very attached to the resource parents. They refer to them as mom and dad. When I'm in the home, I observe them going directly to the resource mother for … all and any of their needs. … I've observed very positive things from them and the resource family." N.T., 1/23/25, at 77. Ms. Beers said J.L.B. was placed in this home in November 2024 and is "a little bit newer…." *Id.* at 77, 84. However, Ms. Kemmerer said J.L.B. was already familiar with the foster parents from visiting with his younger siblings and was calling the foster parents mom and dad by the time of the May 12, 2025 hearing. N.T., 5/12/25, at 126-27. Despite J.L.B.'s being "very responsive" to the foster parents, Ms. Beers said J.L.B. is "still very confused about permanency himself" and it is causing him "great distress[.]" N.T., 1/23/25, at 77. Because of his anxiety, Ms. Beers and Ms. Kemmerer said J.L.B. is starting therapy. *Id.* at 86; N.T., 5/12/25, at 127. Previously, Ms. Beers said J.L.B. had been in the same foster home as O.T.C., but the foster family decided they were unable to meet J.L.B. and O.T.C.'s needs. N.T., 1/23/25, at 83-84, 86.

With respect to O.T.C., Ms. Beers said O.T.C. moved to a new foster home, her second placement, in November 2024. *Id.* at 84. This second placement was not a long-term foster home. *Id.* at 74-75, 83. At the January

23, 2025 hearing, Ms. Beers observed O.T.C. is "really struggling with … being in limbo and not understanding what's next for her. The times that she exhibited the most concerning behaviors are directly correlated with times that she's most unsure about her future and permanency." *Id.* at 76. Ms. Beers said O.T.C. has "shared that she desired for [Mother] to come live with her at her resource home[, and] that she wanted to go and see if [Mother] and [Mother's youngest child, A., who is not involved in this case,] were safe[,]" but noted O.T.C. "has never indicated … that she would like to return to [M]other's care." *Id.* at 81.[6] At the May 12, 2025 hearing, Ms. Kemmerer reported O.T.C. is in the process of transitioning to a new foster home, her third placement. N.T., 5/12/25, at 120-21. Ms. Kemmerer emphasized that O.T.C. is "desperate for permanency…." *Id.* at 147. Ms. Kemmerer said the new placement is extensively aware of O.T.C.'s mental health needs and she hopes O.T.C. can stay in the home long term. *Id.* at 121-22. Ms. Kemmerer said the new foster mother has received more training than other foster parents, is very trauma-informed, and has gone through "similar stuff" with her older daughter who is adopted. *Id.* at 123.

Ms. Wittmaier — an expert in the field of trauma counseling for children and an outpatient therapist at COBYS Family Services — testified at the May 12, 2025 hearing about the trauma-focused cognitive behavioral therapy she has been providing on a weekly basis to O.T.C. since November 2023. *Id.* at

---

[6] The record reflects Mother gave birth to A. in June 2023, and it appears A. has a different father than Children. *See* N.T., 5/12/25, at 77, 137.

26-27. O.T.C. has talked to Ms. Wittmaier about an alleged sexual assault by L.H.B. that occurred when she was less than four years old in Ohio. *Id.* at 30-31. According to Ms. Wittmaier, O.T.C. also described experiencing homelessness while living with Mother. *Id.* at 45.

Ms. Wittmaier opined consistency is important for O.T.C., and when Mother would inconsistently visit with her, it would "bring[] up a lot of emotions that [were] too big for [O.T.C.] to handle." *Id.* at 33. Around April 2024, Ms. Wittmaier stated "there were three[-]and[-]a[-]half months [where Mother] came twice [to visit] when she was supposed to come every other week, and that was very dysregulating" for O.T.C. *Id.* at 38. As a result, Ms. Wittmaier said she recommended O.T.C.'s visits with Mother be paused, and the visits ended in July 2024. *Id.* at 33, 37. Ms. Wittmaier said, the previous week, O.T.C. mentioned she "wonders how [Mother's] doing. But that was about it. She doesn't talk about [Mother] too often." *Id.* at 34. Ms. Wittmaier diagnosed O.T.C. with post-traumatic stress disorder and recommended "[a] plan for permanency" for O.T.C., as "the unknown of the future is just so hard for her." *Id.* at 35; *see also id.* at 32 (Ms. Wittmaier's stating "the grief of moving from home to home has been a big portion of what we've been working through"). At the time of the May 12, 2025 hearing, Ms. Wittmaier noted that O.T.C. was just hospitalized for over a month because she was threatening to harm herself. *Id.* at 39-40.

Ms. Good, a parent trainer at Partners in Parenting, testified at the May 12, 2025 hearing regarding Mother's visits with Children. *Id.* at 75. Ms. Good

said she has supervised Mother's visits with Children for over two years and taught her "hands-on" parenting. *Id.* at 75-76. Ms. Good reported Mother's visitation schedule "started out as one hour every other week and that's what it's been throughout that time period[,]" and noted the majority of visits took place at the county's services center. *Id.* at 76; *see also id.* at 77. Initially, Ms. Good said the visits were with all four Children until O.T.C. stopped attending the visits in July 2024, and noted A. came along to the visits after she was born. *Id.* at 77. When asked to generally describe Mother's attendance at visits, Ms. Good replied:

> It's been somewhat irregular. … I don't believe that she [has] missed a visit since February [2025]. So she's been consistent in the last couple of months. But she went through some times that she didn't attend for long periods of time, like maybe a three-month period that she had one visit or something.
>
> ***
>
> [I]t's been more recently that she's attended. When I look … back over my notes, I believe she missed a total of 12 visits in that 2-year period, and with seeing [C]hildren only every other week, it would add up to like a total of 6 months, if you put it all together. So out of the two years[,] she probably missed a quarter of her time with [C]hildren.

*Id.* at 78-79; *see also id.* at 117-18 (Ms. Kemmerer's detailing the visits Mother missed).

At the visits, which were held in a confined space, Ms. Good said Mother "had some difficulty in being able to know where all her children were at one time[,]" explaining "[i]f [Mother] was paying attention to one child[,] maybe another was climbing … on a rocking chair. Or one time a child was climbing

- 13 -

on a bookcase, and I would have to point out the potential danger….” *Id.* at 80-81; *see also id.* at 87. As a result, Ms. Good had safety concerns about Mother's parenting Children alone without support. *Id.* at 81. Ms. Good also said Mother would sometimes not think about the danger involved in certain activities, like taking Children on a "joyride" in a stroller. *Id.* at 82. Ms. Good testified Mother "presented more like maybe an older sibling to hav[e] fun with, … or [a] baby-sitter, whatever term you want to use, rather than the parent, the adult in the situation." *Id.* at 83. Further, when Ms. Good tried to address situations with Mother, Ms. Good said Mother would not correct the behavior in the future. *See id.* at 80, 83. Ms. Good opined Mother's ability to parent multiple children at once has not improved, and Ms. Good stated she has not made any recommendations to increase the visits or have them take place in a more natural setting. *Id.* at 83-84.

> When asked how Children react to Mother, Ms. Good stated:
>
> So most of the [C]hildren transition very smoothly. I feel like [E.R.B.] has struggled some. There were times that he would cling to his foster mom or ask about his foster mom when they were in a visit. But he's not been really crying. He will go. He's just more reserved. And all the [C]hildren transition pretty readily to spending time with [M]other.

*Id.* at 91.

At the May 12, 2025 hearing, Ms. Kemmer also testified to the progress made by Mother. With respect to whether Mother established and maintained appropriate housing, Ms. Kemmerer acknowledged Mother had secured housing through a program from April 2024 until April 2025. *Id.* at 111.

However, Ms. Kemmerer said Mother's landlord "change[d] the apartment into Section 8 housing, which meant that she had to vacate the premises, which we were still concerned about because that program was only one year long." *Id.* Ms. Kemmerer said Mother currently lives with her sister in Pottstown. *See id.* at 111, 135. In January 2024, Ms. Kemmerer said she spoke with Mother's sister about being a resource for Children, and Mother's sister indicated that there would not be enough space for Children at her home, but she would reach back out "if she wanted to present for" Children in the future. *See id.* at 136; *see also id.* at 111. Ms. Kemmerer said she has not been contacted by Mother's sister since then and has not been to her home. *Id.* at 135-36. Looking forward, Ms. Kemmerer said Mother was working to get housing assistance and had applied for some public housing. *Id.* at 111-12.

Ms. Kemmerer also opined Mother has not established and maintained appropriate income to support Children. *Id.* at 112. Ms. Kemmerer explained Mother has worked in the home healthcare field but "it has not been stable, has not been consistent, and most times it has been part-time, which would not be enough money to care for herself and [her youngest child, A.,] and then the four additional [C]hildren." *Id.* at 112.[7]

Further, Ms. Kemmerer stated Mother has participated in court-ordered evaluations, but Mother's treatment for her mental health and drug and

---

[7] Ms. Kemmerer said Mother has eight children, and only A. currently resides with her. N.T., 5/12/25, at 97. Mother's oldest three children live with paternal family members and are not involved in this matter. *See id.*

alcohol use "is not consistent and she tends to be there for a couple months and then decides she's not comfortable with that agency anymore and then leaves treatment for various reasons." *Id.* at 112-13. Ms. Kemmerer also had concerns that, when Mother has been prescribed medication by psychiatrists, Mother has not followed their recommendations and has "use[d] the marijuana over top of the other psychotropic medications." *Id.* at 114.

Although Mother has participated in casework services specific to A. with a different caseworker, Ms. Kemmerer indicated Mother has not participated in casework services with her regarding Children. *See id.* at 115, 133. Ms. Kemmerer also acknowledged Mother and L.H.B. are no longer together as a couple. *Id.* at 136-37.[8] When asked about what Ms. Kemmerer sees as the major barriers to Mother's imminent reunification with Children, she answered:

> [Mother's] unstable mental health, her continued use of marijuana, her lack of stable and appropriate housing, her lack of consistent stable and appropriate income to support herself, [A.,] and the four [C]hildren, and her inconsistency with visits. [W]e

_____

[8] With respect to the outcome of the sexual assault allegations involving L.H.B., Ms. Kemmerer explained:

> Mahoning County Children and Youth Services in Ohio was investigating th[e] situation. [Mother] left in the middle of the investigation. But after [O.T.C.] had participated in the [Child Advocacy Center-]equivalent interview out there, and at that point in time [O.T.C.] had made credible statements, but because [Mother] left and then informed [L.H.B.] that she was leaving and he subsequently left [Ohio], the investigation came to a stall and would have been, what we considered to be unfounded here. It was never completed.

N.T., 5/12/25, at 100.

have not been able to progress beyond one hour every other week for two[-]and[-]a[-]half years. By this point in time, when we have children who are still in foster care, we're usually doing one weekend visits [*sic*] and reunification, if it's not already occurred.

*Id.* at 118-19.

Ms. Kemmerer said she has no concerns about the foster parents meeting J.L.B., A.M.B., and E.R.B.'s needs, and says she thinks O.T.C.'s new foster mother "will try her best to meet all of [O.T.C.'s] needs." *Id.* at 125; *see also id.* at 127-28. Ms. Kemmerer opined she sees no detriment in terminating the parental rights of Mother to Children. *Id.* at 128. With respect to Mother, Ms. Kemmerer said, "I believe that [Mother] would tell you that she's bonded to the kids, but I don't think the kids are bonded in the same reciprocal manner. They see her as that playmate they go visit every other week." *Id.* at 147.

At the May 12, 2025 hearing, Mother testified she is living with her sister, her sister's husband, her sister's three children, and A. in her sister's five-bedroom house in Pottstown. *Id.* at 156-57. Mother said her sister is prepared to set up the house so Children can live there, but Mother is trying to get her own place. *Id.* at 157. Since moving to Pottstown, Mother conveyed her home healthcare work has been slower, and she has been doing housecleaning to make extra money. *Id.* at 158. Mother explained she is not currently enrolled in any mental health treatment or drug and alcohol treatment because she recently moved from Berks County to Montgomery County and is in the process of transferring her county assistance. *See id.* at 159-60. Mother said she is still smoking marijuana because she cannot quit

on her own. *Id.* at 160. However, she says she is smoking much less than she used to and is trying to stop. *Id.* at 166. Mother disagreed she was inconsistent with her visits with Children, claiming that some of the visits were cancelled by the foster family, and she missed Children's appointments because she was at work. *Id.* at 160-61, 167. With respect to caring for Children, Mother testified her only problem is her finances. *Id.* at 162. Prior to the sexual abuse allegations and having to move from Ohio to Pennsylvania, Mother insisted the family had stability. *Id.* at 163-64.

The orphans' court entered decrees terminating Mother's parental rights to Children on September 5, 2025, pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Mother filed timely notices of appeal, along with concise statements, at each docket on September 26, 2025. The orphans' court subsequently filed a Pa.R.A.P. 1925(a) opinion. On October 28, 2025, this Court consolidated the appeals *sua sponte*. *See* Pa.R.A.P. 513 (addressing the consolidation of multiple appeals). Attorney Cherniack filed an *Anders* brief and application to withdraw on December 17, 2025. In the *Anders* brief, Attorney Cherniack raises the following issues for our review:

> [I.] Whether [BCCYS] failed to prove by clear and convincing evidence that [M]other's parental rights should not [*sic*] have been terminated pursuant to 23 Pa.C.S.[] § 2511(a)(1), (2), (5)[,] and (8)?

> [II.] Whether the [orphans'] court erroneously terminated [M]other's parental rights where there was a strong emotional and parental bond between [M]other and [C]hildren[,] which would have had a negative effect on the [C]hildren if permanently severed?

*Anders* Brief at 5.

## Analysis

### *Anders/Santiago*

Attorney Cherniack claims Mother's appeal is wholly frivolous. Accordingly,

[t]his Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant]. *Commonwealth v. Goodwin*, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*).

Prior to withdrawing as counsel on a direct appeal under *Anders,* counsel must file a brief that meets the requirements established by our Supreme Court in *Santiago.* The brief must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. Counsel also must provide a copy of the *Anders* brief to [her] client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the *Anders* brief." *Commonwealth v. Nischan*, 928 A.2d 349, 353 (Pa. Super. 2007), *appeal denied*, … 936 A.2d 40 ([Pa.] 2007).

*Commonwealth v. Orellana*, 86 A.3d 877, 879-80 (Pa. Super. 2014). After determining that counsel has satisfied these technical requirements of *Anders*

and **Santiago**, this Court must then "conduct a simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

Attorney Cherniack has substantially complied with the above-stated requirements. **Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa. Super. 2007) (observing **Anders** and **Santiago** require substantial, not perfect, compliance). In the **Anders** brief, Attorney Cherniack summarizes the relevant facts and procedural history, albeit with poor citations to the record; she refers to facts in the record she believes could arguably support the appeals; and she concludes Mother's appeals are frivolous.[9] While Attorney Cherniack's discussion and application of the relevant law is scant in reaching her conclusion the appeals are frivolous, we deem the applicable law regarding termination to be straightforward in this matter, and Attorney Cherniack refers to the pertinent provisions of Section 2511 in her analysis. **See id.** (finding

---

[9] Attorney Cherniack's only citations to the record consist of broad references to page numbers without indication as to what the page numbers correspond to in the record. **See, e.g.**, **Anders** Brief at 6 (citing to "Pp. 96-128"). We believe the page numbers refer to the May 12, 2025 hearing transcript. Although we are not pleased with Attorney Cherniack's citations to the record, we reiterate the framework of **Anders** and **Santiago** requires substantial, not perfect performance. **See Matter of Adoption of N.C.H.**, 1335 WDA 2022 & 1336 WDA 2022, unpublished memorandum at 6-7 (Pa. Super. filed June 23, 2023) (finding substantial compliance with the framework of **Anders** and **Santiago** even though counsel failed to cite to the certified record); **see also** Pa.R.A.P. 126(b) (providing unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

substantial compliance where the relevant law was straightforward even though **Anders** brief failed to discuss it).[10]  In addition, Attorney Cherniack states in her application to withdraw she sent a copy of her **Anders** brief to Mother.  Attorney Cherniack also attached a letter addressed to Mother to her application to withdraw, in which she informed Mother of the rights enumerated in **Nischan**.[11]  Thus, Attorney Cherniack has substantially fulfilled the technical requirements for withdrawal.  We now independently review the record to ascertain if Mother's issues are frivolous, and to discern if there are any other, non-frivolous issues she could pursue on appeal.

### Termination of Mother's Parental Rights

Mother contends BCCYS failed to prove that Mother's parental rights should be terminated pursuant to Section 2511(a)(1), (2), (5), and (8). **Anders** Brief at 10.  She also claims the orphans' court erred in terminating her parental rights where there was a strong emotional and parental bond between her and Children, and Children would be negatively affected if the bond was permanently severed.  **Id.** at 13.  BCCYS and Children's GAL/legal counsel do not agree.  **See generally** BCCYS's Brief; Children's GAL/Legal Counsel's Brief.

---

[10] **See also In re I.B.**, No. 1407 MDA 2022, unpublished memorandum at 11 (Pa. Super. filed Mar. 3, 2023) ("[T]he **Anders** brief is sparse in its presentation of controlling law and the application of that law.  … As we find the applicable law regarding termination to be straightforward and referenced in part by [c]ounsel's discussion, we conclude that her brief substantially complies with **Anders** and **Santiago**.") (cleaned up).

[11] To date, Mother has not filed a response.

When considering an orphans' court's determination of a petition for termination of parental rights, we apply an abuse-of-discretion standard. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). We must accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record. *Id.* "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* (citation omitted). Further, "a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* (citation omitted).

Section 2511 governs the termination of parental rights and requires a bifurcated analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order

- 22 -

terminating parental rights. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super.

2004) (*en banc*).

*Section 2511(a)(2)*

We consider the involuntary termination of Mother's rights under Section

2511(a)(2). Section 2511(a)(2) provides a basis for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> This Court has observed:

> To satisfy the requirements of Section 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.

***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (cleaned up).

Here, the orphans' court stated that, despite being "given numerous

opportunities, Mother has not shown … she has the ability to remedy the

conditions which led to the removal of the Children in the first place."

Orphans' Court Opinion ("OCO"), 10/17/25, at 6. While the orphans' court

found it admirable Mother left Ohio to remove Children from abuse allegations,

it noted Mother had no concrete plan in place to care for herself and Children.

*Id.* It discerned "[e]xtensive testimony at trial showed Mother did not have stable housing at times." *Id.* It explained "where Mother intended to reside with the four [C]hildren was not adequate housing[,]" and "Mother's family is not an adequate resource to rely on." *Id.* In addition to living in poverty and being homeless at times, the orphans' court noted Mother "extensively used marijuana as a coping mechanism." *Id.* It considered "[m]ultiple witnesses testified … Mother would not be able to care for these [C]hildren." *Id.* The orphans' court additionally expressed concern over the psychological disorders admitted to by Mother, stating they further prevent Mother from caring for Children. *Id.* It observed Mother failed to comply with some court-ordered services due in part to being transient and conveyed Mother's visits with Children were sporadic. *Id.* at 6-7. Overall, the orphans' court concluded "Mother clearly does not have the ability to provide a loving and stable home for these Children and has not remedied any of the conditions that led to the initial placement." *Id.* at 7.

The record supports the orphans' court conclusion Section 2511(a)(2) has been met. Regarding the first prong of Section 2511(a)(2), the record shows Mother suffers from a repeated and continued incapacity, neglect, or refusal. Specifically, Mother lacks stable housing and income, struggles with marijuana use and mental health issues, and fails to reliably and responsibly care for Children. *See generally* N.T., 1/23/25, at 18; N.T., 5/12/25, at 70-71, 73, 83-84, 118-19.

The second prong of Section 2511(a)(2) is also satisfied. The record demonstrates Mother's incapacity, neglect, or refusal has caused Children to be without essential parental care, control, or subsistence. Children have been removed from Mother's care since August 2022. N.T., 5/12/25, at 99-102. Since that time, Mother has irregularly visited Children and her visitation with them did not progress past a 1-hour supervised visit every other week. *Id.* at 76, 78, 83-84. According to Ms. Beers and Ms. Kemmerer, Mother also failed to attend medical appointments and educational meetings for Children. N.T., 1/23/25, at 66-67, 73; N.T., 5/12/25, at 116.

Finally, the third prong of Section 2511(a)(2) is fulfilled, as the record establishes the causes of Mother's incapacity, neglect, or refusal cannot or will not be remedied given Mother's limited progress during Children's dependency. Mother admitted to still using marijuana at the time of the termination proceedings and conceded she cannot quit smoking marijuana on her own, yet she has inconsistently engaged in treatment for her mental health and marijuana use. N.T., 1/23/25, at 41; N.T., 5/12/25, at 64-66, 159-60. Moreover, while Mother had obtained housing as part of a year-long program at one point, she was living with her sister at the time of the termination proceedings and looking for a new place to live. N.T., 5/12/25, at 111-12, 157-58. Mother's sister had previously told Ms. Kemmerer that there was not enough space for Children at her home. *Id.* at 111, 135-36. Relatedly, Ms. Kemmerer also voiced concerns that Mother's income remained insufficient to support herself, A., and Children, and Mother indicated her

home healthcare work has been slower since moving to Pottstown. *Id.* at 112, 158. Further, although Mother had been consistent with her visits with J.L.B., A.M.B., and E.R.B. since February 2025, Ms. Good said Mother's ability to parent multiple children at once has not improved and Ms. Good did not recommend increasing the visits or moving them to a more natural setting. *Id.* at 83-84.

Based on the foregoing, we observe no abuse of discretion or error of law by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2). Therefore, we next consider Section 2511(b).

*Section 2511(b)*

Section 2511(b) provides, in relevant part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), our Supreme Court has explained:

[C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

***Interest of K.T.***, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

In the case *sub judice*, the orphans' court "found some parent[-]child bond … between Mother and Children." OCO at 7. However, it noted "Children need stability and are currently residing with resource parents." ***Id.*** It stated "while Mother loves the Children, that is not enough to overcome the evidence presented in this case. What is in the best interest of these Children is outweighed by what little evidence was presented regarding the bond between Mother and Children." ***Id.*** at 8. It additionally found "Children are well-bonded with [f]oster [p]arents and … thei[r] interests are best served by terminating Mother's parental rights and opening the Children up for adoption." ***Id.***

> Specifically, with respect to O.T.C., the orphans' court observed:

> [O.T.C.] has special needs…. A number of witnesses testified that [O.T.C.] is anxious to have this matter resolved. She has been treating for mental health issues and testimony showed that Mother cannot provide the help O.T.C. would need. The current resource home is for the long term.

***Id.*** at 7.

Regarding J.L.B., the orphans' court similarly noted witnesses indicated he is anxious to have this matter resolved. ***Id.*** It pointed out J.L.B. is in

therapy and considered testimony showing Mother cannot provide the help J.L.B. would need. *Id.*[12] It further noted his current resource home is for the long term. Decree at Docket No. 88763, 9/5/25, at 2 (unnumbered).

As for A.M.B., the orphans' court opined she "needs stability and is currently residing with resource parents." Decree at Docket No. 88764, 9/5/25, at 2 (unnumbered). The orphans' court reiterated Mother cannot provide the help A.M.B. would need to be raised and weighed that A.M.B.'s current resource home is for the long term. *Id.*

Last, relating to E.R.B., the orphans' court observed he "has special needs" and has treated with a neurologist. OCO at 7.[13] Again, the orphans' court determined Mother cannot provide the help E.R.B. would need, observed the current resource home is for the long term, and noted E.R.B.'s need for stability. *Id.*; *see also* Decree at Docket No. 88765, 9/5/25, at 2 (unnumbered).

The record again supports the orphans' court's conclusion that Section 2511(b) is satisfied. Mother has only had mostly sporadic supervised visits

---

[12] The orphans' court also stated J.L.B. has respiratory issues. OCO at 7. Based on our review of the transcript, however, we believe E.R.B. has respiratory issues, not J.L.B. *See* N.T., 5/12/25, at 127, 144.

[13] The orphans' court said E.R.B. has been treating with a neurologist every six months. OCO at 7. However, we note Ms. Beers testified E.R.B.'s "last neurology appointment took place on December 8, 2024, and he no longer needs to be seen there." N.T., 1/23/25, at 85. Nevertheless, Ms. Kemmerer indicated E.R.B. still "has some special medical needs like asthma[,]" and mentioned he had to be "airlifted to Philadelphia with breathing issues." N.T., 5/12/25, at 127, 144.

with Children for one hour every other week since March 2023, and has not visited with O.T.C. since July 2024. *See* N.T., 5/12/25, at 76-77, 117-18. Testimony from Ms. Good and Ms. Kemmerer suggested Children view Mother as more of a playmate than a parent. *Id.* at 83, 147. Ms. Kemmerer opined no detriment would be caused to Children by terminating the parental rights of Mother. *Id.* at 147.

Moreover, specifically regarding A.M.B. and E.R.B., Ms. Beers and Ms. Kemmerer each testified that A.M.B. and E.R.B. are very bonded with their foster parents, whom they have resided with since 2022 and call mom and dad. N.T., 1/23/25, at 76-77; N.T., 5/12/25, at 125-26. Ms. Beers and Ms. Kemmerer conveyed foster parents meet A.M.B. and E.R.B.'s needs. N.T., 1/23/25, at 77; N.T., 5/12/25, at 127-28. We further note A.M.B. has an individualized educational plan and E.R.B. has had medical issues, yet Ms. Beer and Ms. Kemmerer testified Mother has not attended meetings or appointments for either child relating to these matters. N.T., 1/23/25, at 66-68, 73, 85; N.T., 5/12/25, at 116, 127, 144.

With respect to J.L.B., Ms. Kemmerer said J.L.B. also now calls his foster parents mom and dad. N.T., 5/12/25, at 126-27. J.L.B., additionally, has expressed concerns for stability, and both Ms. Beers and Ms. Kemmerer relayed the lack of permanency has been causing him distress. N.T., 1/23/25, at 77, 86; N.T., 5/12/25, at 127. Ms. Kemmerer said she has no concerns about foster parents meeting J.L.B.'s needs. N.T., 5/12/25, at 127-28.

Turning to O.T.C., the record establishes O.T.C. ceased having visits with Mother in July 2024, at the recommendation of Ms. Wittmaier, as Mother's inconsistent visits caused O.T.C. emotional distress. *Id.* at 33, 37. Ms. Wittmaier said O.T.C. does not talk about Mother very often and recommended a plan for permanency for O.T.C. *Id.* at 34-35. Ms. Beers also stated O.T.C. has never indicated she wants to return to Mother's care. N.T., 1/23/25, at 81. Although O.T.C. was transitioning to her third placement at the time of the May 12, 2025 termination hearing, Ms. Kemmerer said the new foster mother is aware of O.T.C.'s mental health needs and has received additional training. N.T., 5/12/25, at 121-23. Ms. Kemmerer also hoped O.T.C. could stay in the placement long term and believed O.T.C.'s new foster mother will try her best to meet O.T.C.'s needs. *Id.* at 121-22, 125, 128. Ms. Kemmerer emphasized O.T.C. is desperate for permanency. *Id.* at 147.

Based on our review of the record, we see no basis to overturn the orphans' court's finding that termination of Mother's parental rights would best serve Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

In conclusion, we agree with Attorney Cherniack that Mother's issues are frivolous, and our review of the record reveals no other, non-frivolous issues she could pursue on appeal. Accordingly, we grant Attorney Cherniack's application to withdraw and affirm the decrees.

Decrees affirmed. Application to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 03/24/2026